## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RUTH M. COOPER<br>*Plaintiff*,<br><br>v.<br><br>YALE UNIVERSITY,<br>*Defendant*. | No. 3:21-cv-1552 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Ruth Cooper brings this action against her former employer, Yale University ("Yale") alleging that Yale discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et* seq. Cooper claims that Yale terminated her because of her race and age, subjected her to a hostile work environment, and retaliated against her when she complained about discrimination. Yale moves for summary judgment on all of Cooper's claims. For the reasons set forth below, I grant Yale's motion for summary judgment, except as to the retaliation claim under CFEPA, which I dismiss without prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits.[1] All facts are undisputed unless otherwise indicated.

---

[1] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." This Court is "under no 'obligation . . . to perform an independent review of the record to find proof of a factual dispute' if the non-moving party fails to designate specific facts showing a genuine dispute of material fact." *Chalco v. Belair*, 738 F. App'x 705, 709 (2d

The Plaintiff, Ruth Cooper, was employed by Yale from February 4, 1991 until her employment was terminated on January 7, 2020. ECF No. 35 ¶ 2; ECF No. 40-2 ¶ 2. Cooper is an African-American woman. ECF No. 35 ¶ 1; ECF No. 40-2 ¶ 1. Her date of birth is March 30, 1960, and she was 59 years old when she was terminated. ECF No. 35 ¶ 1; ECF No. 40-2 ¶ 1. Throughout her employment at Yale, she worked in the Department of Laboratory Medicine (the "Department"). ECF No. 40-3 at 17. According to Cooper, she started as an Administrative Assistant and rose through the ranks to become the Department's Lead Administrator. ECF No. 40-3 at 14-16; ECF No. 35 ¶ 3; ECF No. 40-2 ¶ 3. Prior to her termination, Cooper was "the only African-American manager in the Department." ECF No. 1 ¶ 8; ECF No. 17 ¶ 8 (Yale admitting this fact in its Answer).

## A. Audit Results and 2015 Demotion

In 2013, when Cooper was serving as Lead Administrator, "routine internal auditing of [her] Department uncovered certain … deficiencies."[2] ECF No. 35 ¶ 3; ECF No. 40-2 ¶ 3; ECF No. 40-3 at 45-47. In her testimony, Cooper conceded that the audit discovered "deficiencies in [her] abilities," including "paperwork [that] wasn't completed" by employees she supervised.

---

Cir. 2018) (summary order) (citations omitted); *accord Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Court not required to assist parties who file deficient Local Rule 56 Statements by conducting "an exhaustive search of the entire record before ruling on a motion for summary judgment").

[2] Cooper denies without citation several paragraphs in the defendant's Local Rule 56(a)1 statement "so much as [the defendant] relies on [an Affidavit from Donna Espenberg]." *See* ECF No. 40-2 ¶¶ 3-7, 10. Since the paragraphs discuss events that happened prior to 2017, and "Espenberg admits that she did not become the [Cooper's] supervisor until 'the fall of 2017,'" Cooper contends that those portions of Espenberg's affidavit constitute "inadmissible hearsay." *Id.*; *id.* at 1. But some of those paragraphs merely recite information from documents such as performance evaluations that were obviously available to Espenberg, and so the "hearsay" objection is overruled with respect to such facts. *See, e.g.*, ECF No. 34-10 ¶ 3 (reciting performance deficiencies found by 2013 audit). Further, several of the paragraphs in the defendant's Local Rule 56(a)1 statement are supported by other admissible evidence. *See, e.g.*, *id.* ¶ 3 (citing Cooper's testimony in addition to Espenberg's affidavit). Therefore, to the extent that the paragraphs rely on admissible evidence, I consider them admitted. I also deem admitted several other paragraphs that Cooper either does not respond to or denies without a specific citation. *See, e.g.*, ECF No. 40-2 ¶¶ 27, 29, 30, 33. Local Rule 56(a)3 provides that "each denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Because Cooper failed to comply with Local Rule 56(a)3 in several of her denials, she has failed to establish that these facts are disputed.

ECF No. 40-3 at 46-47; *see also id.* at 20, 47 (Cooper testifying that the Department's "accountant and other members of [her] staff ... didn't follow the Yale policy in some procedures of their work" and acknowledging that it was her responsibility to ensure that her staff did their jobs). Cooper claims she "corrected [those deficiencies] after the audit." *Id.* at 46.

On Cooper's Fiscal Year ("FY") 2014 performance evaluation,[3] she "received an overall rating of 'needs improvement'" due, in part, to "compliance issues" that created a "high financial risk to the Department." ECF No. 35 ¶ 6; ECF No. 40-2 ¶ 6. The evaluation mentioned that the audit "identified 8 findings ... in the areas of the highest risk," and auditors then returned "after only 18 months, rather than the typical 3 year cycle," and "found that 3 of the earlier findings had not been addressed." ECF No. 34-3 at 2. The evaluation describes the audit results as "very serious" and concludes that Cooper was "not functioning at the level expected of a Lead Administrator." *Id.* At the time, Cooper "did not complain to anyone that she believed her 'needs improvement rating' was discriminatory." ECF No. 35 ¶ 7; ECF No. 40-2 ¶ 7.

On January 21, 2015, Brian Smith, Cooper's supervisor, "issued a letter to [Cooper] outlining areas of unsatisfactory performance." ECF No. 35 ¶ 8; ECF No. 40-2 ¶ 8. Among other issues, the letter stated that "the internal audit findings continued to be of concern" and cited "complaints from faculty members concerning the plaintiff's performance in her role as Lead Administrator." ECF No. 35 ¶ 8; ECF No. 40-2 ¶ 8; *see* ECF No. 34-4 at 2 ("[T]he faculty have lost confidence in your ability to successfully support them. The areas of major concern with your performance are responsiveness and follow-through, compliance with Yale grants management and financial policies and procedures as well as your ability to understand the department's clinical practice and interface effectively with Yale-New Haven Hospital leadership."). "Shortly after the January 21, 2015 letter," Cooper's "duties and responsibilities

---

[3] The FY 2014 evaluation covers the period from September 1, 2013 through August 31, 2014.

were altered," and "she began reporting to Steven Gentile," who was a Lead Administrator. ECF No. 35 ¶ 10; ECF No. 40-2 ¶ 10. According to Cooper, Gentile wrote "a new job description" for her, which ultimately became the "operations manager" position she held until her discharge. ECF No. 34-2 at 13. She testified that the new position was a "demotion." ECF No. 40-3 at 51.

The parties dispute the fairness of the audit and the FY 2014 performance evaluation that formed the basis for this demotion. Although Cooper admits that no faculty member discriminated against her, ECF No. 35 ¶ 9; ECF No. 40-2 ¶ 9, she testified that she felt the audit was discriminatory. ECF No. 40-3 at 27-29. She admits that the auditor did not make any comments about her race. ECF No. 35 ¶ 28; ECF No. 40-2 ¶ 28. But she claims that the auditor "stopped grilling [her] about the procedures she followed when she informed [the auditor] that they were procedures that were … used by" previous administrators, whom the auditor knew were white. ECF No. 40-2 ¶ 28; *see* ECF No. 40-3 at 30. And, Cooper claims, the auditor asked her if she "had the chair sign off on large journal entries," although Cooper knew that two white Lead Administrators did not "ask their chair to sign off on journal entries." *Id.* at 31. Cooper also testified that the auditor was "very brash," "demeaning," and "unprofessional" towards her. ECF No. 40-3 at 29. For instance, when the internal auditor "wanted information, she would hover over" Cooper. *Id.*

Further, Cooper maintains that Brian Smith and Deputy Dean Cynthia Walker discriminated against her when preparing the FY 2014 performance review and demoting her. *Id.* at 26-27. She claims that an audit of the Department during Gentile's tenure as Lead Administrator made "findings similar to the ones that internal auditing found under [her] management," but Gentile was not demoted.[4] *Id.* at 204. She also contends that Smith did not

---

[4] Yale responds that this allegation is made "without any specifics or evidentiary support." ECF No. 45 at 7. Cooper does not provide the audit report from Gentile's tenure.

provide her with the support that he provided to other Departments. *Id.* at 166 (testifying that Smith refused her request to hire additional staff); *id.* at 25-27 (testifying that she told Smith "about the issues that [she] was having … in the department … with certain faculty members … and he wouldn't do anything to assist [her]," and that issue was later listed as a finding in the audit). Finally, she accused Smith of raising issues she does not "believe were actually true" in the performance review. *Id.* at 28.  In particular, she expressed skepticism about his claim that members of the faculty had lost confidence in her. *Id.* at 35 (testifying that "[Smith] would not tell me the names of those faculty members," but agreeing that she did not "know one way or the other whether it is indeed true that faculty members lost confidence" in her); *id.* at 50 (testifying that, when Smith replaced her with Gentile, she asked if the decision was "about the faculty" and "he said no … the faculty love you").

## B.  Gentile's Management of the Department

After Cooper's demotion, Steven Gentile supervised Cooper's work from February of 2015 until October of 2017. ECF No. 35 ¶¶ 10-11; ECF No. 40-2 ¶¶ 10-11; ECF No. 40-5 at 1. During this time, Cooper claims that her "performance met or exceeded expectations and her dedication and performance were positively lauded." ECF No. 40-2 ¶ 15. On performance evaluations for FYs 2015, 2016, and 2017,[5] Cooper received an overall rating of "met/exceeded expectations." ECF No. 40-5 at 1-8. As Cooper highlights, the FY 2015 and FY 2017 performance evaluations describe some of the challenges that Cooper faced before her demotion. *See* ECF No. 40-5 at 1 ("The Department has been very under resourced over the last year, especially with the departure of an accountant in the summer of 2014," and Cooper "was the key individual that managed all the day to day administrative, financial and operational functions of

---

[5] The FY 2015 evaluation covers the period from July 1, 2014 to June 30, 2015; the FY 2016 evaluation covers the period from September 1, 2015 to August 31, 2016, and the FY 2017 evaluation covers the period from September 1, 2016 to August 31, 2017.

the Department in FY15"); *id.* at 7 (noting that Cooper "was basically handling every aspect of the financial, administrative, and HR functions of the Department" when Gentile took over). Gentile also praised aspects of Cooper's work. *See, e.g.*, *id.* at 1 (stating that Cooper "went above and beyond and was one of the main reasons we were able to get through this very difficult … period"); *id.* (calling Cooper "a very loyal and dedicated employee" and adding that "[m]any faculty members … referenced [her] loyalty and dedication"); *id.* at 4 (stating that Cooper "continues to manage well all of the finance/administrative functions"). At the end of his tenure, Gentile wrote that he and Cooper had "been able to enhance the [Department] infrastructure to provide efficient and effective support." *Id.* at 7. In that evaluation, he rated Cooper "exceptional" on one subcategory, Administrative Services Manager, and "met/exceeded expectations" on all other subcategories. *Id.* at 8.

**C. Change in Leadership and FY 2018 Performance Evaluation**

"In the fall of 2017, Donna Espenberg became the Department's Lead Administrator," replacing Gentile as Cooper's supervisor. ECF No. 35 ¶ 11; ECF No. 40-2 ¶ 11. Cooper and Espenberg knew one another "casually" before Espenberg joined the Department. ECF No. 35 ¶ 12; ECF No. 40-2 ¶ 12. Espenberg is white, and she is 1 year and 2 months younger than Cooper. ECF No. 17 ¶ 13; ECF No. 35 ¶ 13; ECF No. 40-2 ¶ 13. Espenberg "was also the Lead Administrator of the business office of the Department of Therapeutic Radiology at Yale," and she supervised and promoted two African-American managers in that Department. ECF No. 35 ¶ 14; ECF No. 40-2 ¶ 14 (denying this statement as not relevant, without citation).

Cooper claims that, "as soon as Espenberg took over … she began treating [Cooper] more harshly than other employees," and giving negative ratings that "were based on

discrimination." ECF No. 40-2 ¶ 15.[6] Yale disagrees, asserting that Espenberg faulted Cooper for legitimate performance issues. Espenberg never made any comments about Cooper's race. ECF No. 35 ¶ 27; ECF No. 40-2 (not responding to this statement).

Espenberg wrote Cooper's performance evaluation for FY 2018, and Cooper's overall rating remained "met/exceeded expectations."[7] ECF No. 40-5 at 10. However, Espenberg rated Cooper "needs improvement" in two subcategories: Risk Manager and Administrative Services Manager. *Id.* at 12-14. In the Risk Manager subsection, Espenberg wrote that Cooper was responsible for "maintain[ing] strong controls for the entire department including sponsored and non-sponsored financial activities." *Id.* at 12. She added that Cooper needed "to partner with [the Research Operations Manager]," who was "responsible for executing the terms and conditions of specific grants," to "ensure that together they are running a 'tight ship.'" *Id.* In the Administrative Services Manager subsection, Espenberg pointed to "challenges as regards onboarding of new faculty resulting in a diminution in faculty satisfaction." *Id.* at 14; *see also id.* ("I would like to see Ruth tighten up these processes …. Important for Ruth's success is to really pay attention to details and shoot for accuracy while exercising sound time management skills.").

Cooper disagrees with Espenberg's characterization of her work. She argues that the Risk Manager subsection "inaccurate[ly]" accused her of violating Yale's policies and procedures.

---

[6] Cooper claims that Espenberg treated her less favorably than five white employees: Dina Bohan, Dana Lombardi, Peter Stadolnik, Mark Firla, and Michael Moccio. The parties agree that three of these employees, Bohan, Stadolnik, and Moccio, are younger than Cooper. ECF No. 17 ¶¶ 41-42, 44. From the parties' filings, it is unclear whether Lombardi and Firla are younger than Cooper. At the time of the alleged events, Bohan and Lombardi were both "Clerical and Technical ("C&T") union employees" who "reported to [Cooper]." ECF No. 35 ¶ 32; ECF No. 40-2 ¶ 32. Cooper testified that Firla was also a C&T union employee and agreed that Firla's position was not "similar" to hers. ECF No. 40-3 at 144. Stadolnik was the Operations Manager in another department, the Department of Therapeutic Radiology. ECF No. 35 ¶ 31; ECF No. 40-2 ¶ 31 (denying statement "as written," solely because the statement does not mention that "Stadolnik had the same position as previously held by the plaintiff, and was supervised by the same person, Espenberg"). Neither party states what Moccio's role in the Department was, although he took over Cooper's Internal Service Provider ("ISP") management responsibilities after she accepted a phased retirement plan. ECF No. 17 ¶ 44.

[7] The FY 2018 performance evaluation covers the period from July 1, 2017 to June 30, 2018.

ECF No. 40-2 ¶ 16. She felt that Espenberg "faulted" her for following Yale's policies "instead of doing things the way Peter Stadolnik did them." *Id.* Stadolnik is "a white male manager and [Cooper's] counterpart … in another Department overseen by Espenberg." *Id.*  Cooper testified that she "did follow or did [her] best to follow Yale policies and procedures," but when she "didn't follow the practices of Peter Stadolnik in [Espenberg's] other department, Donna Espenberg always felt that it was wrong." ECF No. 40-3 at 65. *But see id.* (Cooper testifying that she may have "unintentionally" violated "certain policies and procedures"). Cooper also claims that the Risk Manager subsection misrepresented "the scope and purview" of her job responsibilities when it stated that she was responsible for "sponsored and non-sponsored financial activities." ECF No. 40-2 ¶ 16; *see* ECF No. 40-3 at 66 (Cooper testifying that she "was not responsible for sponsored"). Finally, Cooper disagrees with the portion of the performance evaluation blaming her for issues onboarding new faculty. According to Cooper, "the cause of [the onboarding issue] was the difficult personality of the new faculty member and beyond [her] control." ECF No. 40-2 ¶ 16; *see* ECF No. 40-3 at 69-70 (Cooper testifying that she "explained to [Espenberg] how the onboarding process was done, and it was very successful, never had any issues in the past …. But as I said, this particular faculty member was a little more demanding….").

### D.  April 11, 2019 Meeting

The parties agree that Cooper and Espenberg had a meeting on April 11, 2019, where Cooper told Espenberg that "she believed that [Espenberg] was discriminating against her." ECF No. 35 ¶ 25; ECF No 40-2 ¶ 25. However, Cooper and Espenberg's account of the meeting differs from there. Cooper testified that:

> [The meeting was] in Peter Stadolnik's office. He was present, as was Donna Espenberg. We were discussing … budgets for our departments, lab medicine and

[therapeutic radiation ("T-Rad")], and Donna, she started using the word cracking the whip on me about laboratory medicine's budgetary process because it wasn't really the same as the way Peter Stadolnik would prepare T-Rad's budget .... And Donna -- as Peter and I were discussing, you know, the budgets, Donna kept saying, well, how come you don't do it the way Peter does it. And I would say, well, Donna, you know, I've been doing the budget for years, and this is how I was trained to do it. As long as the end result is the same, what difference really does it make. And she just kept on and on and on. And finally that's when I had said to her, I said, Donna, I said why are you always so harsh on me and not on others. And that's when I told her, I said I really feel that you are discriminating against me, and … I don't like this. I think you're discriminating against me. And as she was walking out the door, she made a statement. She said, oh, you can't -- are you serious. And I said yes, and then she just walked out the door.

ECF No. 40-3 at 81-83.

Yale claims that it was actually Cooper who used the phrase "cracking the whip." ECF No. 45 at 4. As Yale points out, the Complaint in this case alleges that Cooper "asked Espenberg why she 'cracked the whip' on her," and the affidavit Cooper submitted to the Connecticut Human Rights Commission used the same language. ECF No. 1 ¶ 17; ECF No. 45-1 at 8. Yale also claims that Cooper "retracted the discrimination complaints made at the April 2019 meeting by quickly following it up to state that she was kidding." ECF No. 45 at 4. Cooper testified that after Espenberg said "are you serious" or "are you kidding," she responded, "yeah, I'm just kidding." ECF No. 40-3 at 83-84, 86. But, after some prompting from her lawyer, Cooper also testified that she made this response "almost in a sarcastic manner because I felt that … she was … dismissing me when she said are you joking or kidding." *Id.* at 87.

**E. Aftermath of Meeting and Performance Improvement Plan**

In May of 2019, Espenberg implemented a 90-day Performance Improvement Plan ("PIP") for Cooper. ECF No. 35 ¶ 17; ECF No. 40-2 ¶ 17. The PIP identified "areas requiring improvement," including "professional judgment, decision-making and communication style; demonstrating adequate understanding of critical aspects of human resource and finance

responsibilities; accuracy and attention to detail; follow-through on assigned projects; and staff management." ECF No. 35 ¶ 19; ECF No. 40-2 ¶ 19.

The parties disagree about the true purpose of the PIP. Yale claims that the PIP was necessary "because of continued deficiencies in [Cooper's] performance." ECF No. 35 ¶ 17. It argues these deficiencies were "similar to issues with the plaintiff's performance previously identified in 2014 and 2015 while working under a different supervisor." *Id.* ¶ 21; *see* ECF No. 40-3 at 74 (Cooper agreeing that the PIP was "not the first time" she was "told there were issues … regarding resource and finance," and "probably not" the first time she was "told that [she] had issues with staff management" in her "years at Yale"). Cooper contends that "the PIP was implemented in retaliation for the [her] complaints … about the racially discriminatory conduct of Espenberg." ECF No. 40-2 ¶ 17. Cooper either denies the performance deficiencies that formed the basis for the PIP or alleges that white employees who engaged in similar conduct were not punished. *Id.* ¶ 19 (denying that the areas stated in the PIP "needed improvement"); *id.* ¶ 25 (asserting that the PIP's claims were "either untrue, or other, white employees who engaged in similar conduct were not punished therefor").

The first "area for improvement" listed in the PIP is "[p]rofessional judgment, decision-making and communication style." ECF No. 34-6 at 3. Espenberg wrote that Cooper's "verbal and written communications are perceived by others as offensive, unclear and misleading," and accused Cooper of "using unprofessional language during conversations with colleagues" and "voicing frustrations with processes in front of subordinates." *Id.* Cooper denies that her communications required improvement. ECF No. 40-2 ¶ 19. She cites her comments on her FY 2019 performance evaluation, which state that she "immediately took corrective action to ensure that [her] tone, statements made, and actions [were] professional" after she learned that others

perceived them as "offensive and unprofessional." ECF No. 40-5 at 23. That document does not

deny that she used unprofessional language before the PIP. *Id.*

Cooper also alleges that other white employees used the same "words and phrases" as she

did, but Espenberg only viewed those words and phrases as "unprofessional" when Cooper used

them. ECF No. 1 ¶ 23. Asked to identify these "words and phrases" in an interrogatory, Cooper

wrote:

> At a professional meeting addressing coworkers and employees, the Chairman, a white male, made a comment when asked about a new program Yale was using called Proposal Development (PD). The Chairman … responded by saying, "I think PD sucks." At a meeting with business office staff … Donna Espenberg discussed relocating a co-worker (Mark Firla) to the business office space. When asked how I felt about the idea, my response was "I think it sucks." Donna Espenberg was angry that I used this terminology. After the meeting, Donna Espenberg informed me that she felt my statement was unprofessional. Neither Mark Firla or Dr. Brian Smith were in the meeting when I made the statement, and I told Donna Espenberg that I was simply being honest.

ECF No. 40-6 at 18; *see also* ECF No. 40-3 at 163 ("Q. Do you agree that saying this sucks at a

business meeting … is unprofessional? A. No."). In another interrogatory response, Cooper

stated that Staldonik, Assistant Administrator Dina Bohan, and Financial Assistant Dana

Lombardi, all of whom are white, were not faulted for using the same tone as Cooper. *Id.* at 15;

*see also* ECF No. 40-3 at 123 ("[M]y attitude was no different than many of the other non-

African Americans in the business office, and she didn't fault any of them, but she faulted me.").

Specifically, Cooper testified that after Bohan missed a meeting, she told Espenberg "no, I didn't

attend the meeting; I was busy; it wasn't on my calendar; just send me some other dates and I'll

go at another time." ECF No. 40-3 at 155. Cooper felt that if she had spoken to Espenberg the

same way, Espenberg would have said her "tone was unprofessional." *Id.* at 155-56. Cooper also

testified that Michael Moccio, one of her coworkers, told her that Lombardi had "burst into his

office and started yelling at him." *Id.* at 129-30. By Moccio's account, when he complained to

Espenberg about Lombardi's behavior, she recommended he "read a certain book on how to deal with these situations, but she did not penalize Dana Lombardi for her tone and her attitude." *Id.* at 130. Generally, Cooper testified, Lombardi would use a "tone … that may not have been professional," and "because [Espenberg] really liked her … it was acceptable." *Id.* at 156.

Next, the PIP faults Cooper for inadequately managing assigned staff. ECF No. 34-6 at 5. Cooper testified one of the changes Espenberg wanted was for Cooper to set up a schedule for two employees she supervised, Dana Lombardi and Gloria White. ECF No. 40-3 at 123. According to Cooper, this requirement arose out of an incident where she and Lombardi "were out of the office at the same time," because Espenberg asked Cooper to attend a meeting on central campus. *Id.* Cooper and Lombardi provided coverage for each other in certain areas. *Id.* at 126. Cooper felt it was unfair for Espenberg to complain about a single incident where she and Lombardi were out of the office at the same time, since such events were "rare," Cooper had her cell phone, and she could have returned from central campus quickly if there was an emergency. *Id.* at 123-24, 126-27. Cooper also testified that other employees who "were supposed to provide coverage for one another," including Dina Bohan and James Suprenant, were not criticized for being out of the office at the same time. *Id.* at 125-26.

The PIP also criticizes Cooper for having a "deficient understanding of Administration concepts," including "most aspects of financial management and reporting." ECF No. 34-6 at 3-4. And the PIP accuses Cooper of lacking "accuracy and attention to detail," and failing to "follow-through on assigned projects and tasks." ECF No. 34-6 at 4-5. Cooper does not cite any portions of her deposition testimony that address these allegations, and instead relies on the comments she left on her FY 2019 performance evaluation. ECF No. 40-2 ¶ 19. In those comments, Cooper asserted that she "perform[s] finance and reporting for responsibilities that

fall under [her] purview and only reach[es] out to others [when] absolutely necessary." ECF No. 40-7 at 8. Responding to allegations that she lacked "accuracy and attention to detail," Cooper wrote that "[t]here was a document that had a typo that I did not notice and have since made a greater effort to carefully review all documents. The ISP incorrect balance was an oversight … but was quickly corrected and the PI notified." *Id.* at 9. And, addressing complaints that she had "inconsistent follow-through on assigned projects and tasks," Cooper wrote that, "[m]any of the tasks … were completed by the specified due date, but unfortunately some open action items that did not have a due date remained open. This is an area that I agree requires improvement and that I am currently working on." *Id.*

Beyond the PIP, Cooper alleges that "the disparate treatment and discrimination got significantly worse" after she accused Espenberg of discriminating against her. ECF No. 40-2 ¶ 25. In her interrogatory responses, Cooper states that Espenberg's "treatment … became harassing. She immediately began complaining about my work and faulting everything I did." ECF No. 40-6 at 10. In particular, Cooper says that Espenberg "blamed [her] for mistakes/errors made by others." *Id.* For example, she claims that Espenberg "accused [her] of entering an incorrect percentage," but when Cooper found documentation showing that Gentile was to blame, Espenberg "refused to read the documentation and did not apologize." *Id.* According to Cooper, Espenberg also "accused [her] of forwarding a private email from Dr. Smith to the NIH," and failed to apologize after Cooper explained that she did not forward the email. *Id.* And Cooper testified that Espenberg blamed her for a "situation" with internal service providers, even though Moccio "said it was [his] fault." ECF No. 40-3 at 141. Cooper also contends that white employees were not faulted for the types of errors that she was punished for. *See, e.g.*, ECF No. No. 40-3 at 142-43 (testifying that Mark Firla was not disciplined after "one of the faculty

members was having extreme difficulty with his performance," and he made errors like failing to book a hotel room for a visiting guest"); *id.* at 157-58 (testifying that Espenberg did not "criticize or discipline" Lombardi for sending a form with "some errors on it," but Cooper was "disciplined" when she made further revisions to the document and Espenberg "still wasn't happy" with it); ECF No. 40-6 at 9 (interrogatory response alleging Dina Bohan was not "reprimanded or disciplined" for failing to clear Department's suspense account).

In particular, Cooper claims that Espenberg treated her less favorably than Peter Stadolnik. Cooper says Espenberg would "criticize [Cooper] if [her] work processes" differed from Stadolnik's, telling Cooper she "didn't know what [she] was doing and reprimanding [her]." ECF No. 40-6 at 11. And, when Stadolnik failed to make "labor adjustments for certain employees" that were necessary for a quarterly budget report, Cooper submits that Espenberg blamed her for Stadolnik's error.[8] *Id.* at 8; ECF No. 40-3 at 116-17. On another occasion, Cooper claims that Stadolnik refused to "hand over" a spreadsheet to a faculty member, even after Espenberg asked him to do so, and Cooper believes that Espenberg did not criticize him for his refusal. ECF No. 40-3 at 147-49. Cooper also claims that Espenberg denied her request for vacation time because she had not completed an optional Q0 budget or finished some other non-urgent work. ECF No. 40-6 at 11. But, Cooper attests, Stadolnik said he "was absolutely not completing a Q0 budget for [Espenberg's other department] and didn't know of any other department that was completing it since it was optional." *Id.* Cooper believes Espenberg "allowed all the other white" employees "to take their vacation." *Id.* Espenberg also allegedly

---

[8] The timing of this event is unclear, but it likely occurred around the time of the April 11, 2019 meeting. In her interrogatory responses, Cooper says Stadolnik failed to complete the labor adjustments in April of 2019. ECF No. 40-6 at 8. Her testimony indicates that deadline to complete the labor adjustments may have been April 12. *See* ECF No. 40-3 at 117 (Q. Is it fair to say that when Ms. Espenberg called you on April 10th, two days before those reports were due, that you were still working on it? A. I may have been."). Therefore, Espenberg may have criticized her on or around April 12.

required Cooper to "create financial spreadsheets" using available Workday reports, rather than Excel, even though Stadolnik "created similar Excel spreadsheets with no objection from … Espenberg." *Id.*

Finally, Cooper points to an incident that allegedly occurred while Cooper was managing a "minor 'pest' issue." ECF No. 40-6 at 16.[9] The pest issue had forced the Department to temporarily move out of its Church Street office, and Cooper claims that the pest control company asked her to walk through that office to check for new pest activity. *Id.* Lombardi, who was sharing a space with Cooper in the Department's temporary quarters, was apparently "enraged" that Cooper had done the walk through. *Id.* After Lombardi complained to Espenberg, Cooper testified that,

> [Espenberg] called me into her office and was very angry with me and said that I caused trauma to Dana Lombardi, that Dana Lombardi no longer wanted to share an office space with me …. [A]nd when I tried to explain to [Espenberg] that I was following her instructions and that of the pest control technician … I just did a walk through … [Espenberg] said, well, some people are just cleaner than others.

ECF No. 40-3 at 132-34. Cooper claims that this final comment "betray[ed] [Espenberg's] race based disgust and revulsion for [Cooper]," by "suggesting that the white employee is cleaner than the black employee." ECF No. 40-2 ¶ 26. After this incident, Espenberg moved Lombardi to a new office, so she would not have to share a space with Cooper. ECF No. 40-3 at 137-38.

### F.  End of PIP and FY 2019 Evaluation

Cooper and Espenberg met six times "to discuss [Cooper's] efforts in meeting the goals set forth in the [PIP]." ECF No. 35 ¶ 22; ECF No. 40-2 ¶ 22. The parties disagree about whether Cooper successfully completed the PIP. Yale claims that Cooper "developed her own action plan to address" the deficiencies described in the PIP, but "did not successfully complete" the PIP.

---

[9] Cooper testified that this incident occurred "before" the PIP. ECF No. 40-3 at 135-36.

ECF No. 35 ¶¶ 20, 23. Cooper claims that she "cooperated with Espenberg and Lorenzo and did whatever was asked of her by Espenberg, in the PIP and otherwise, and did so successfully." ECF No. 40-2 ¶¶ 20, 23.

Cooper testified that she met with two human resources employees, Diana Lorenzo and Santo Galatioto, about the PIP. ECF No. 40-3 at 76-77, 87. She recalls that she told Lorenzo she "didn't agree with the PIP," but Lorenzo told her to "come up with a plan … to present to [Espenberg], and … just follow the PIP." *Id.* at 77. Cooper says she raised her concerns that the PIP was discriminatory to Galatioto. *Id.* at 87. By Cooper's account, Galatioto told her she "should contact the EEOC if [she] felt [she] was being discriminated against." *Id.* at 88.

Despite her skepticism about the PIP, Cooper claims she "did everything that Espenberg requested, including meeting with Diana Lorenzo, meeting with Espenberg, providing documentation of her efforts, taking classes, setting up schedule[s] for the employees she supervised, and everything else requested of her." ECF No. 40-2 ¶ 20. Cooper testified that:

> Diana Lorenzo … told me to do everything that was in the PIP that [Espenberg] asked, and I did. And week after week every time I met with [Espenberg] and would provide her with the documentation. She asked me to take … classes. I took the classes. She asked me to set up scheduling for the two employees that I supervised. I did that. But every time I met with [Espenberg] each week, every two weeks, she kept putting down this, that I failed to meet, that I failed to improve, and I just couldn't understand why she kept saying that I failed to improve.

ECF No. 40-3 at 93. Espenberg's notes on her six PIP meetings with Cooper state that Cooper made "inadequate progress," "fail[ed] to meet performance objectives," and "failed to meet success measures." ECF No. 34-6 at 6. Cooper testified that she felt "very stressed" during the PIP, and she applied to several other jobs and considered applying for a leave of absence. ECF No. 40-3 at 95-97.

On Cooper's FY 2019 performance evaluation,[10] Espenberg rated Cooper's performance "unsatisfactory" overall. ECF No. 35 ¶ 24; ECF No. 40-2 ¶ 24; *see* ECF No. 40-7 at 1 (stating that Cooper had a "challenging year"). Espenberg wrote that, "[w]ith guidance and instruction, [Cooper] is able to make the required YSM deadlines … however, the timeliness of completion for my review and accuracy of drafts remains a problem. In fact, I was not given the opportunity to review the Q3 submission or narrative before [Cooper] submitted directly to [Yale School of Medicine], even though I had requested an extension." ECF No. 40-7 at 1. Espenberg rated Cooper's performance "needs improvement" in four categories (Strategic Resource, Talent Developer, Administrative Services Manager, and Financial Analyst), and "unsatisfactory" in two categories (University Citizen and Risk Manager). *Id.* at 1-6.

Cooper submitted comments responding to the FY 2019 performance evaluation. *Id.* at 8-9. She wrote that she "[did] not agree with the overall [unsatisfactory] rating" in the performance evaluation. *Id.* at 8. And she disputed certain claims Espenberg made about her performance. See*, e.g.*, *id.* (disputing claim that she failed to maintain "strong internal controls"); *id.* (disputing claim that she was unable to "perform finance and reporting for responsibilities that fall under [her] purview" and adding "there was never any doubt in [her] mind" that she would complete the "fiscal year close" on time, though it "came right down to the wire"). On the other hand, her comments appear to acknowledge certain performance issues during the fiscal year. *See, e.g.*, *id.* at 8 (acknowledging "challenges with the reimbursement process"); *id.* at 9 (acknowledging that "[i]nconsistent follow-through on assigned projects and tasks … is an area that … requires improvement").  But she maintained that she had addressed most of the issues, or was working on addressing them. *See, e.g.*, *id.* at 8 (stating that "[w]hen notified that my verbal and written communications were perceived by others as offensive and unprofessional, I immediately took

---

[10] The FY 2019 performance plan covers the period from July 1, 2018 through June 30, 2019.

corrective action"); *id.* at 9 (stating that she "met with direct reports and verbally established the work performance expectations"); *id.* (stating that she was "working … to ensure that all projects and tasks are completed in a timely fashion").

In late August of 2019, Cooper learned that she had failed the PIP. ECF No. 34-7 at 2; ECF No. 40-3 at 115. On September 12, 2019, Espenberg gave Cooper a "written warning for poor performance in [her] role as Operations Manager for the Department." ECF No. 34-7 at 2; ECF No. 35 ¶ 23; ECF No. 40-2 ¶ 23. Espenberg's letter stated that Cooper had "not shown sustained improvement in [her] performance and issues continue to arise," and her "lack of initiative, lack of attention to details, poor customer service, delayed communication, failure to consistently meet deadlines and complete tasks timely has continued…." ECF No. 34-7 at 2. The letter warned that Cooper needed to "demonstrate immediate and sustained improvement," or she would "be subject to further disciplinary action, up to and including termination." *Id.*

### G. Phased Retirement Plan and Termination

On September 24, 2019, Cooper sent Brian Smith an email informing him that she "would like to go on phased retirement as of November 1, 2019." ECF No. 34-9 at 4. The parties disagree about the impetus for this email. Cooper claims that Yale forced her to retire; Yale claims that Cooper did so voluntarily.

Cooper testified that it was Espenberg who "first brought up" retirement. ECF No. 40-3 at 127. According to Cooper, Espenberg said that "if she could retire at [Cooper's] age, she would go ahead and do it. And … maybe [Cooper] should consider retiring." *Id.* at 128. After Cooper learned that she had failed the PIP, she claims she met with Diana Lorenzo, who told her that her options were "either finding a job outside of Yale or taking an early retirement." *Id.* at 105. Cooper says she told Lorenzo that she "felt [she] was too young," and "did not want to

retire." *Id.* at 105-06. But since Lorenzo communicated that "finding another job outside or the phased retirement …. were the only two options other than being literally fired," Cooper asked for paperwork on phased retirement, which Lorenzo provided. *Id.* at 107-08. Next, Cooper says, Lorenzo instructed her to email Brian Smith about phased retirement, but told her not to cc Espenberg. *Id.* at 108. Cooper speculates that Lorenzo hoped excluding Espenberg would "make it seem, falsely, as if the decision to retire was [Cooper's], rather than the desperate sole option open to her to avoid the baseless termination orchestrated by Espenberg." ECF No. 40-2 ¶ 34.

Yale disagrees with Cooper's account of these events, arguing that "it was [Cooper's] choice to go on phased retirement, and … she made this decision prior to discussing the topic with Ms. Lorenzo." ECF No. 45 at 4. Yale points to Cooper's September 24 email informing Smith that she "would like to go on phased retirement," which stated that Cooper would "schedule a meeting with Diana Lorenzo to discuss." ECF No. 34-9 at 3. The next day, Cooper emailed Lorenzo:

> Do I need to set up a meeting with all to discuss the phased retirement? I read the policy and know that the phased retirement needs to be approved by [Smith] and [Espenberg]. Please let me know what I need to do next. I want to take this time to THANK YOU very much Diana for all your assistance and wonderful guidance. It really means a lot to me.

ECF No. 34-9 at 2. Lorenzo replied, "Once you receive all the paperwork, you and I can meet to discuss options. Dr. Smith and [Espenberg] have already approved a one year phased retirement plan. We just need to work out the details once you sign the phased retirement agreement." *Id.* On October 2, 2019, a Support Specialist in the Human Resources Department sent Lorenzo more information on the phased retirement plan. ECF No. 35 ¶ 36; ECF No. 40-2 ¶ 36; ECF No. 34-9 at 4.

Lorenzo followed up on October 18 to ask if Cooper "[w]ould … like to meet today to finalize the agreement." ECF No. 34-9 at 21. Cooper signed the Phased Retirement Plan Election and Agreement form that day, but she claims Lorenzo "pressured" her to sign it, and she did so only "under duress." ECF No. 35 ¶ 37; ECF No 40-2 ¶ 37. Cooper testified that,

> I felt I was signing it under duress …. I had a failed PIP. I had an unsatisfactory focus form, and [Lorenzo] … was putting pressure on me. Okay, what are you going to do, are you going to resign, what are you going to do …. I explained to her that … an attorney had not reviewed it, and I felt uncomfortable signing this document because I would be signing it under duress. And her statement to me was, well, you know, just sign it …. [P]eople can't wait to get out of Yale. Just sign the document. So I signed it because I felt pressured into it.

ECF No. 40-3 at 109-110.

Cooper alleges that Yale "made a number of promises about what [Cooper's] work, her position and her pay would be after signing the retirement agreement," but "[n]one of these [promises] were honored by [Yale.]" ECF No. 1 ¶ 35. After she signed, Cooper contends, Yale "immediately" reduced her time at the workplace, and "attempted to move [her] out of her office," thus "isolat[ing] her … from all of her colleagues and staff." ECF No. 40-6 at 6. Cooper claims she was told "Espenberg would write a different position for [her]" with "new duties," but she was later informed these new duties were "basically … to cross train Michael Moccio, Dina [Bohan] and Peter Stadolnik in doing what [Cooper's] previous job was." ECF No. 40-3 at 185-86. Cooper describes the new duties as "humiliating and demeaning make-work job[s]." ECF No. 40-6 at 6. In its Answer, Yale admitted that Cooper "was instructed to transition her duties" to Moccio, Bohan, and Stadolnik. ECF No. 17 ¶¶ 41-45. All three employees are white and younger than Cooper, *id.*, and all had "no disciplinary history, had never been demoted, and had never received a 'needs improvement' or 'unsatisfactory' performance review at the time of the

events alleged in this lawsuit," ECF No. 35 ¶ 29; ECF No. 40-2 ¶ 29 (denying statement "as written," without citation).

After Cooper began the phased retirement plan, her attorney sent Yale a letter "claiming that the Phased Retirement Agreement was void and seeking to have [Cooper] reinstated to her previous employment position." ECF No. 35 ¶ 38; ECF No. 40-2 ¶ 38. "Yale then revoked the Phased Retirement Agreement," and "returned [Cooper] to her position." ECF No. 35 ¶ 39; ECF No. 40-2 ¶ 39. On January 7, 2020, Yale terminated Cooper. ECF No. 40-2 at 28; ECF No. 17 ¶ 50 (Yale admitting that Cooper was terminated on this date).

## H. Procedural History

Cooper filed her Complaint on November 19, 2021. ECF No. 1. The Complaint alleges that Yale violated Title VII, the ADEA, and CFEPA by discriminating against her because of her age and race, subjecting her to a hostile work environment, wrongfully terminating her, and retaliating against her for complaining about the discrimination she faced. *Id.* ¶ 1. Cooper also claims Yale is liable for intentional infliction of emotional distress under Connecticut law. *Id.* Cooper's Complaint does not discuss the audit, Cooper's 2015 demotion, or any other specific events prior to 2018. *Id.* ¶¶ 1-55. The racial discrimination claim in the Complaint is based on her treatment during Espenberg's supervision of the Department. *Id.* ¶¶ 23-55.

Yale moved for summary judgment on June 30, 2023. ECF No. 34. Cooper filed an objection to Yale's Motion for Summary Judgment on September 27, 2023, ECF No. 40, and Yale replied to that objection on October 23, 2023, ECF No. 45.

## III.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v.*

*Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted)

## IV.   DISCUSSION

### A. Disparate Treatment Claims

Cooper alleges that Yale discriminated against her, and ultimately terminated her, because of her race and age, in violation of Title VII, CFEPA, and the ADEA. Title VII provides that it is an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise … discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m). "An

employment decision, then, violates Title VII when it is based in whole or *in part* on discrimination." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (internal quotation marks omitted). CFEPA claims are analyzed using the same standards as Title VII claims, so I consider the racial discrimination claims in Counts One (Title VII) and Three (CFEPA) together in this ruling. *Johnson v. Connecticut*, 798 F. Supp. 2d 379, 386 (D. Conn. 2011) ("The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting this provision of the CFEPA … [and] this Court will analyze the Title VII claim and the CFEPA claim simultaneously." (internal citations and quotation marks omitted)).

The ADEA provides that it is unlawful for an employer to "discharge any individual or otherwise discriminate against any individual … because of such individual's age." 29 U.S.C. § 623(a)(1). The "ADEA's prohibition against [age-based] discharge protects employees who are at least 40 years of age." *Choate v. Transp. Logistics Corp.*, 234 F. Supp. 2d 125, 128 (D. Conn. 2002) (citing 29 U.S.C. § 631(a)). The standard to establish age discrimination under the ADEA is more demanding than the standard to establish race discrimination under Title VII: the "motivating factor" test "does not apply," and the "ADEA plaintiff must prove that age was a 'but for' cause of the adverse employment action." *Weisenbach v. LQ Mgmt.*, No. 3:13-CV-01663 (MPS), 2015 WL 5680322, at *7 (D. Conn. Sept. 25, 2015) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). However, the Connecticut Appellate Court has held that all discrimination claims brought under CFEPA still apply Title VII's "motivating factor test." *See Wallace v. Caring Sols., LLC*, 213 Conn. App. 605, 626 (2022) ("[T]he motivating factor test, and not the but-for test, remains the applicable causation standard for claims of

discrimination under CFEPA, regardless of the federal precedent established in *Gross* and its progeny.").[11]

Race and age discrimination claims under Title VII, the ADEA, and CFEPA are all analyzed under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Johnson*, 798 F. Supp. 2d at 386-90 (applying *McDonnell Douglas* burden shifting to race discrimination claims brought under Title VII and CFEPA); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (applying *McDonnell Douglas* burden shifting to age discrimination claims brought under ADEA). Under *McDonnell Douglas*, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Holcomb*, 521 F.3d at 138. To establish a prima facie case of age or race discrimination, the plaintiff must demonstrate that: "(1) that [she] belonged to a protected class; (2) that [she] was qualified for the position he held; (3) that [she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138 (Title VII claim); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001) (ADEA claim). "[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis*." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) (internal quotation marks omitted). In determining whether the plaintiff has met her de minimis initial burden of showing "circumstances giving rise

---

[11] In *Weisenbach v. LQ Management*, I predicted that the Connecticut Supreme Court would treat "a finding that the person who terminated [the plaintiff] was motivated in part by age-based animus" as "sufficient … for age discrimination under [CFEPA]—even though it would not be sufficient for liability under the [ADEA]." 2015 WL 5680322, at *1. Since I wrote that decision, the Connecticut Appellate Court has held that all CFEPA discrimination claims should be analyzed under the motivating factor test. *Wallace*, 213 Conn. App. at 626. Though the Connecticut Supreme Court has not "expressly addressed whether the 'motivating factor' standard still applies to CFEPA claims" after *Gross*, *Weisenbach*, 2015 WL 5680322, at *7, I find the Connecticut Appellate Court's argument in *Wallace* persuasive, and see no need to revise my prediction that Connecticut's Supreme Court will apply the motivating factor test to CFEPA age discrimination claims.

to an inference of discrimination," "the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Cronin*, 46 F.3d at 204 (internal quotation marks omitted). "It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Id.* (internal quotation marks omitted).

"If the plaintiff [establishes a prima facie case], the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted). Under the second prong of *McDonnell Douglas*, the defendant bears only a "burden of production," not persuasion. *Id.* at 141. "If the employer puts forth a legitimate, non-discriminatory justification … the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107-08 (2d Cir. 2019) "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Holcomb,* 421 F.3d at 138 (internal quotation marks omitted).

### 1.  Race Discrimination

(i) Prima Facie Case

Yale does not dispute that Cooper "satisfies the first three elements of a prima facie case of age and race discrimination." ECF No. 34-1 at 13. However, the parties disagree as to whether the fourth prong of the prima facie case has been satisfied, i.e., whether Cooper has met her burden of showing that "the adverse employment action[s] occurred under circumstances giving rise to an inference of discriminatory intent," *Holcomb*, 521 F.3d at 138.

I assume without deciding that Cooper has made a prima facie case of racial discrimination. "The fact that a plaintiff was replaced by someone outside the protected class

will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis." *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015); *see also Moore v. Dep't of Correction*, No. 3:13-CV-01160 (JAM), 2017 WL 2413690, at *12 (D. Conn. June 2, 2017) ("Plaintiff has also met his minimal burden of showing that he was disciplined in a manner that gives rise to an inference of discrimination: the person who replaced plaintiff—and whom he had to train—was an employee (white female) outside of his protected class."). Here, Cooper has presented evidence that she was asked to train three white employees to take over her job responsibilities after she was allegedly pressured to accept early retirement.[12] *See* ECF No. 17 ¶¶ 41-45; ECF No. 40-3 at 186.

(ii)  Nondiscriminatory Reason

If the plaintiff meets her initial burden of establishing her prima facie case, the burden shifts to the defendant to produce evidence that it terminated the plaintiff's employment "for a legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At this stage, I must determine whether Yale has introduced evidence that, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993) (emphasis in original). "[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *Id.*

---

[12] Yale disputes Cooper's claim that she was forced to take early retirement, but there is a genuine dispute of fact as to this issue. A reasonable jury could credit Cooper's testimony that she only emailed Smith to ask for phased retirement because Lorenzo communicated that "finding a job outside or the phased retirement …. were the only two options other than literally being fired." ECF No. 30-4 at 105. The fact that Cooper's email to Smith indicated that she was planning on meeting with Lorenzo, ECF No. 34-9 at 3, does not mean she never met with Lorenzo to discuss phased retirement before emailing Smith. Indeed, Cooper thanked Lorenzo for "all [her] assistance and wonderful guidance" the day after she emailed Smith. *Id.* a 2. Yale also contends that Cooper's testimony about her meeting with Lorenzo is hearsay, ECF No. 45 at 5, but I disagree. Cooper's testimony regarding her meeting with Lorenzo is admissible (1) to the extent it is introduced to establish Cooper's motivation for emailing Smith, rather than the truth of Lorenzo's statement, and (2) to the extent the statement was "made by [Yale's] … employee on a matter within the scope of [the employment relationship] and while it existed," Fed. R. Evid. 801(d)(2)(D).

Yale has met this burden by producing admissible evidence that Cooper was terminated because of "poor performance" that, it claims, "continued over the course of several years." ECF No. 34-1 at 18-19. On Cooper's FY 2018 performance evaluation, Espenberg rated her "needs improvement" in the Risk Manager and Administrative Services Manager categories, ECF No. 34-5, and Espenberg's affidavit states that Cooper "failed to follow certain policies and experienced difficulties onboarding new faculty members," ECF No. 34-10 ¶ 13. In May of 2019, Espenberg implemented a PIP, which identified several performance issues, including "professional judgment, decision-making and communication style; demonstrating adequate understanding of critical aspects of human resource and finance responsibilities; accuracy and attention to detail; follow-through on assigned projects; and staff management." *Id.* ¶ 16; *see* ECF No. 34-6. Espenberg attests that Cooper "did not successfully complete the Performance Improvement Plan," ECF No. 34-10 ¶ 18, and Cooper received a "written warning for poor performance" on September 12, 2019, ECF No. 34-7. The written warning stated that performance "issues continue to arise," including "lack of initiative, lack of attention to details, poor customer service, delayed communication, [and] failure to consistently meet deadlines and complete tasks [on time]." ECF No. 34-7 at 2. Cooper's FY 2019 performance evaluation rated her performance "unsatisfactory" overall and mentioned ongoing issues with the "timeliness of completion" of tasks, and "accuracy of drafts," among other things. ECF No. 34-8 at 2.

(iii) <u>Pretext</u>

Since Yale has produced a legitimate nondiscriminatory reason for its actions, I must consider whether Cooper "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision[s] to [implement a PIP and] fire [her] w[ere] based, at least in part, on the fact that [she is African-American]." *Holcomb*, 521

27

F.3d at 141. To "defeat summary judgment ... the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (alterations in original) (citation and internal quotation marks omitted). The admissible evidence must allow a reasonable jury to conclude that Yale's stated reason for suspending and terminating Baker "was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.,* 509 U.S. at 515 (emphasis in original). Cooper contends that she has met this burden by introducing evidence that (1) some of the performance issues Yale identified were inaccurate, (2) similarly situated white employees who engaged in comparable conduct were not disciplined, and (3) Espenberg made statements that "betray[ed] her race based disgust and revulsion for [Cooper]." ECF No. 40-1 at 18. For the reasons below, the evidence Cooper cites is insufficient to permit a reasonable jury to conclude that Yale fired Cooper because of her race.

Performance Issues

Cooper disputes many of the performance issues Yale identified in Cooper's FY 2018 and 2019 performance reviews, the PIP, and the September 12, 2019 written warning. "Proof that the employer's proffered reason for the adverse employment action is unworthy of belief constitutes 'circumstantial evidence that is probative of intentional discrimination.'" *Henderson v. Gen. Elec. Co.*, 469 F. Supp. 2d 2, 13-14 (D. Conn. 2006) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)). But here, "the probative value of the proof that [Yale's] explanation is false" is too weak to support an inference that Yale discriminated against Cooper. *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001) (citations and internal quotations omitted).

Cooper has submitted admissible evidence disputing several of the allegations Yale makes about her performance. For instance, in Cooper's FY 2018 performance evaluation, Espenberg rated Cooper "needs improvement" in two subcategories, Risk Manager and Administrative Services Manager, ECF No. 40-5 at 12, 14, and Espenberg's affidavit states that Cooper "failed to follow certain policies and experienced difficulties in onboarding new faculty members as noted in the Evaluation," ECF No. 34-10 ¶ 13. Cooper testified, however, that she generally followed Yale policies, but "Espenberg always felt that it was wrong" if she failed to "follow the practices of Peter Stadolnik." ECF No. 40-3 at 65. To the extent she may have violated Yale policies, Cooper claims that she did so "unintentionally." *Id.*; *see also id.* at 67-68 ("I may have made errors in certain areas to follow – unintentionally did not follow the policies."). And Cooper testified that the issues onboarding the new faculty member were "beyond [her] control," and the faculty member was "very demanding and very difficult." *Id.* at 69.

Cooper submits evidence contesting some—but not all—of the performance issues listed in the PIP. Cooper testified that she "did not agree" with the PIP, *id.* at 76, and her comments on the FY 2019 performance evaluation contradict one of the grounds for the PIP, *see* ECF No. 40-7 at 8 ("I do perform finance and reporting for responsibilities that fall under my purview and only reach out to others when absolutely necessary."). Cooper also flatly disagrees with Espenberg's contention that she failed the PIP, as she claims she "did everything that Espenberg requested." *Id.* at 40-3 at 93. And Cooper points out that Yale asked her to train her replacements, ECF No. 17 ¶¶ 41-45, which, she claims, contradicts Yale's assertion that she was "incompetent in her job." ECF No. 40-1 at 34. But Cooper's comments on her FY 2019 performance evaluation admit to certain performance issues. *See* ECF No. 40-7 at 9 (admitting "a document … had a

typo that I did not notice and have since made a greater effort to carefully review all documents"); *id.* (stating that "[t]he ISP incorrect balance was an oversight … but was quickly corrected"); *id.* (admitting that "some open action items that did not have a due date remained open. This is an area that I agree requires improvement and that I am currently working on."). And for some other performance issues mentioned in the PIP, Cooper does not deny the underlying conduct, but instead argues that the conduct was not objectionable. *See* ECF No. 40-3 at 163 (Cooper testifying that she did not think it was "unprofessional" to say an idea "sucks" in a meeting); *id.* at 123-24 (Cooper testifying that Espenberg should not have faulted her for being out of the office at the same time as Lombardi); ECF No. 40-7 at 8 (Cooper admitting that the "fiscal year close … came right down to the wire," but claiming she "never [had] any doubt" she would complete the work on time).

Cooper claims that Espenberg's reviews of her performance represented a significant departure from the performance evaluations Steven Gentile prepared for FYs 2015, 2016 and 2017. Gentile rated her performance "met/exceeded expectations" in every category, except the Administrative Services manager category, for which he rated her "exceptional" in FY 2017. ECF No. 40-5 at 1-8. He also made positive comments about her contributions to the department. *See, e.g. id.* at 1 ("[Cooper] went above and beyond and was one of the main reasons we were able to get through this very difficult … period …. [She] is a very loyal and dedicated employee to Lab Medicine"). On the other hand, in 2014 and 2015, previous supervisors Brian Smith and Cynthia Walker faulted Cooper for several performance issues, some of which are similar to the issues Espenberg later reported. *See* ECF No. 34-3 at 2 (FY 2014 evaluation rating Cooper "needs improvement" in Financial Advisor and Risk Manager sections due to audit findings); ECF No. 34-4 at 2 (2015 letter from Smith describing "areas of major concern" including

"responsiveness and follow through, compliance with Yale grants management and financial policies and procedures as well as [Cooper's] ability to understand the department's clinical practice and to interface effectively with Yale-New Haven Hospital leadership."). Cooper acknowledged that the PIP was "not the first time" she was "told there were issues … regarding resource and finance," and "probably not" the first time she was "told that [she] had issues with staff management." ECF No. 40-3 at 74.[13]

All told, a reasonable jury could not conclude, based on this evidence, that Yale's reasons for discharging Cooper were pretextual. Cooper relies primarily on her own assessment of her performance, and she has admitted to some of the performance issues cited by Yale. Her overall disagreement with the bottom-line conclusions Yale drew about her performance does not raise a genuine dispute about whether Yale's reasons for terminating her were pretextual. *See Ricks v. Conde Nast Publications, Inc.*, 6 F. App'x 74, 78 (2d Cir. 2001) (summary order) ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent."); *Henderson*, 469 F. Supp. 2d at 15 (finding insufficient evidence of pretext where employee admitted to performance issues).

Comparator Evidence

Next, Cooper argues that Espenberg treated similarly situated white employees more favorably than her. Cooper identifies five white employees whom she claims received superior

---

[13] Cooper argues that the 2013 and 2014 audits, and her 2015 demotion, were discriminatory. She testified that the auditor asked her if she "had the chair sign off on large journal entries, but she knew that two white Lead Administrators, Steve Gentile and Cathy Velluci, were not required to get chair sign off on journal entries. ECF No. 40-3 at 31. But she cites no evidence that the auditor knew that Gentile and Velluci did not obtain these approvals, and, in any event, the issue concerning journal entries was not among the adverse audit findings mentioned in her FY 2014 performance evaluation or Smith's January 2015 letter. *See* ECF No. 40-3 at 45-47; ECF No. 35 ¶ 6; ECF No. 40-2 ¶ 6; ECF No. 34-3 at 2; ECF No. 34-4. Cooper also claims that Gentile was not "punished or demoted" after "substantially similar" audit results, ECF No. 40-3 at 204, although her testimony on this point, when pressed, was, more modestly, that "some of the issues that were raised by internal auditing were similar," *id.* at 208. Apart from the fact that Cooper's Complaint does not challenge her 2015 demotion and that any such challenge would be time-barred, her testimony does not diminish the point that the issues raised in the FY 2014 evaluation and Smith's January 2015 letter resembled the issues for which Espenberg's letter faulted her in the PIP and FY 2019 performance evaluation and for which Yale ultimately fired her.

treatment: Dina Bohan, Dana Lombardi, Peter Stadolnik, Mark Firla, and Michael Moccio.[14] ECF No. 40-1 at 48. According to Cooper, Espenberg blamed her for mistakes these employees made. *See, e.g.*, ECF No. 40-6 at 8 (alleging that Espenberg blamed Cooper when Stadolnik failed to complete work on time). Cooper also claims that Espenberg placed unfair restrictions on her work and punished her for behavior she tolerated from other employees. *See, e.g.*, ECF No. 40-3 at 129-30, 155-56 (testifying that Lombardi and Bohan were not faulted for using unprofessional language or "tone"); ECF No. 40-3 at 142-43 (testifying that Firla was not disciplined after faculty had "extreme difficulty with his performance"); ECF No. 40-6 at 11 (alleging that Espenberg faulted her if her work processes differed from Stadolnik's, required her to create a Q0 budget that Stadolnik did not have to create, and prohibited her but not Stadolnik from creating financial spreadsheets in Excel).

"A showing that similarly situated employees belonging to a different racial group received more favorable treatment can … serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). Two employees are "similarly situated" only if they are "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). Thus, the employees must be "subject to the same performance evaluation and discipline standards." *Graham*, 230 F.3d at 40. "In the

---

[14] As discussed, *see* note 13, *supra*, Cooper also suggests that Steve Gentile and Cathy Velluci were white comparators who were treated more favorably. But apart from the infirmities in that suggestion, *see note* 13, *supra*, Cooper has not submitted evidence that Espenberg supervised or had any role in disciplinary decisions with respect to Gentile or Velluci. So she has failed to raise a genuine dispute about whether those individuals were "similarly situated in all material respects."

Cooper also claims she was disciplined for using the same language as Department Chair Brian Smith (i.e., for saying an idea "sucks" in a meeting). ECF No. 40-6 at 18. But since Smith was Espenberg's superior, he is not similarly situated to Cooper. Finally, to the extent Cooper makes general statements that she was treated worse than other employees, without providing sufficient information to determine whether those employees were comparable, I do not consider those claims. *See* ECF No. 40-6 at 11 (Cooper alleging that Espenberg allowed "all the other white" employees "to take their vacation").

context of employee discipline … the plaintiff and the similarly situated employee must have 'engaged in comparable conduct,' that is, conduct of 'comparable seriousness.'" *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (quoting *Graham*, 230 F.3d at 39). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," *Graham*, 230 F.3d. at 39, but "[t]his rule is not absolute … and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met," *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001). Here, no reasonable jury could conclude that Dina Bohan, Dana Lombardi, Peter Stadolnik, Mark Firla, or Michael Moccio were similarly situated to Cooper in all material respects.

First, during the relevant time period, Bohan, Lombardi, and Firla were all Clerical and Technical ("C&T") union employees. ECF No. 35 ¶ 32; ECF No. 40-2 ¶ 32; ECF No. 40-3 at 144. Cooper testified that the process for disciplining C&T employees is "different" because Yale must "deal with the union shop steward" and cannot "just take disciplinary action." ECF No. 40-3 at 144. In fact, Bohan and Lombardi reported to Cooper, ECF No. 35 ¶ 32; ECF No. 40-2 ¶ 32, and Cooper admitted that Firla was not "similar to [her]" and held a "[d]ifferent position[]," ECF No. 40-3 at 144. Therefore, Bohan, Lombardi, and Firla were not "subject to the same performance evaluation and discipline standards" as Cooper. *Graham*, 230 F.3d. at 40; *see Gaddy v. Philadelphia Hous. Auth.*, No. 06-CV-04570, 2008 WL 2928485, at *6 (E.D. Pa. July 28, 2008) (finding employee was not a "similarly situated individual because, unlike [the plaintiff], he is a union member"); *Johnson v. Pepsi Cola Gen. Bottlers, Inc.*, No. 04-CV-00325, 2005 WL 1629895, at *7 (E.D. Wis. July 6, 2005) ("When one employee is a union member, and the other is not, the two employees are not similarly situated…."); *Smalls v. Amazon.com Servs.*, 20-CV-05492, 13 (E.D.N.Y. Feb. 7, 2022) ("[S]upervisors and non-managerial employees [are]

differently situated for purposes of assessing discriminatory intent."). Cooper does not provide sufficient evidence about Michael Moccio to raise a genuine issue of material fact about whether he was similarly situated to Cooper; based on the record the parties cite, I cannot determine his position or responsibilities at Yale or to whom he reported.

By contrast, a reasonable jury could conclude that Peter Stadolnik was "subject to the same performance evaluation and discipline standards" as Cooper. *Graham*, 230 F.3d. at 40. Cooper testified that Stadolnik was an Operations Manager in the Department of Therapeutic Radiology, ECF No. 40-3 at 145, another department that Espenberg supervised, ECF No. 35 ¶ 14; ECF No. 40-2 ¶ 14. Cooper also testified that Espenberg frequently compared her work to Stadolnik's or encouraged her to follow the same procedures as Stadolnik. ECF No. 40-3 at 65, 81-82, 145. Therefore, though Stadolnik worked in a different department, a reasonable jury could conclude that this difference was not material, since he had the same title and supervisor and performed similar functions.

The question, then, is whether there is a genuine issue of material fact as to whether Cooper and Stadolnik engaged in "comparable conduct." *Raspardo*, 770 F.3d at 126. Cooper admits that a 2014 audit of the Department, which she supervised at the time, uncovered "deficiencies." ECF No. 35 ¶ 3; ECF No. 40-2 ¶ 3; ECF No. 40-3 at 20, 46-47 (Cooper testifying that her staff failed to complete certain paperwork, and she was the one responsible for "be[ing] sure that the staff did [that paperwork]"). In her FY 2019 performance evaluation, Cooper conceded that she did not notice a typo in a document, made an "oversight" that led to an "incorrect balance," and allowed "open actions items that did not have a due date [to] remain open." ECF No. 40-5 at 23-24. She acknowledged in comments to the FY 2019 performance evaluation that the "fiscal year close … came right down to the wire," although she added that

34

"there was never any doubt in [her] mind" that she would "complete it on time." *Id.* at 23. Similarly, Cooper admits that she and Lombardi were out of the office at the same time, although she denies that this was a problem. ECF No. 40-3 at 123-24. Finally, Cooper admits that, when asked for her thoughts on a plan to move Mark Firla to the business office, she said, "I think it sucks," ECF No. 40-6 at 18, although she argues that white colleagues like Lombardi and Bohan were not punished for using similar language.

Regardless of Cooper's opinions of the seriousness of her acknowledged "oversights," it is undisputed that these and others were cited as the basis for the adverse ratings in her FY 2018 and FY 2019 performance reviews. Staldonik, by contrast, had "no disciplinary history, had never been demoted, and had never received a 'needs improvement' or 'unsatisfactory' performance review." ECF No. 35 ¶ 29; ECF No. 40-2 ¶ 29 (denying this statement without citation). But Cooper argues that his record was clear only because he "engaged in conduct with impunity" that Cooper would have been punished for. ECF No. 40-2 ¶ 29. She offers three examples. First, she claims that Stadolnik failed to make "labor adjustments for certain employees" by the quarterly budget report deadline, but Espenberg blamed Cooper for Stadolnik's failure to finish his work. ECF No. 40-6 at 8. Second, she claims that Stadolnik refused to give a spreadsheet to a faculty member, even after the faculty member requested it and Espenberg directed him to hand it over. ECF No. 40-3 at 147-48. Third, she claims that Espenberg insisted that she implement a new budget procedure called "Q0" even though it was optional and even though Stadolnik told Cooper that he was not going "to do [a Q0 budget]." ECF No. 40-3 at 146. She admitted, however, that she did not actually know whether Stadolnik had implemented the Q0 budget. *Id.* at 147.

No reasonable jury could conclude that Cooper and Stadolnik were similarly situated based on these three incidents. Cooper's performance issues were much more numerous, longstanding, and broader in scope that Staldonik's. And Cooper had a longer history of performance issues. By the time Espenberg became Cooper's supervisor, Cooper had supervised the Department through two unfavorable audits, received a "needs improvement" rating on a performance evaluation, received a warning letter, and been demoted from her position as Lead Administrator.[15] Further, some of the issues noted by Espenberg in the FY 2018 and FY 2019 performance reviews were similar to the issues raised about Cooper before Espenberg began supervising her. There is no evidence of a similar history or similar breadth of issues with Stadolnik. Therefore, the fact that Espenberg treated Cooper differently from Stadolnik on these few occasions does not support an inference that Espenberg discriminated against her.

Discriminatory Remarks

Finally, Cooper points to two incidents where she claims Espenberg made comments that indicated racial animus. In the April 11, 2019 meeting, Cooper testified that Espenberg "started using the word 'cracking the whip' on me about laboratory medicine's budgetary process." ECF No. 40-3 at 81. Cooper also points to the pest-control incident, where Espenberg allegedly

---

[15] Cooper claims that the audit, performance evaluation, and demotion were discriminatory, but the evidence she cites is insufficient to raise a genuine dispute of material fact. To support her claim that the audit was discriminatory, she relies on (1) her subjective disagreement with certain issues the auditors identified, (2) testimony that the auditor stopped asking her questions about her procedure after learning that previous (white) administrators used the same procedure, (3) testimony that the auditor asked her whether she had "the chair sign off on large journal entries," though other Administrators did not obtain Chair signoff, and (4) testimony that the auditor was rude to her. None of this evidence is sufficient to establish racial discrimination. And, though Cooper disagrees with some of the issues raised in the audit, Cooper admits that the auditor uncovered "deficiencies," including that her staff failed to fill out paperwork. ECF No. 35 ¶ 3; ECF No. 40-2 ¶ 3; ECF No. 40-3 at 20, 46-67. Likewise, Cooper presents little evidence that Smith discriminated against her when he demoted her. Her subjective disagreement with the performance issues Smith identified, or her frustration that he did not help her resolve an issue with certain faculty members, are not probative of discrimination. Nor is her claim that Gentile was not demoted after similar audit results, since she does not substantiate this claim with sufficient information to determine whether Gentile was similarly situated, and the negative audit result was just one of several issues that Smith raised regarding Cooper's performance.

accused Cooper of "caus[ing] trauma" to a white co-worker, and told Cooper that "some people are cleaner than others." ECF No. 40-2 ¶ 26. Yale points out that Cooper attributed the "cracking the whip" comment to herself in her Complaint. ECF No. 1 ¶ 17; *see also* ECF No. 45-1 at 8 ¶ 15 (Plaintiff's CHRO affidavit also attributing "cracking the whip" comment to Plaintiff). Such an "assertion of fact in a pleading is a judicial admission by which [a party] normally is bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Algonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).

But even if a reasonable jury could find that Espenberg made both statements, they do not raise a genuine dispute about whether Espenberg harbored racially discriminatory intent. Both statements are facially race-neutral. To be sure, race-neutral comments can be "probative of bias" depending on "various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that use of the term "boy" to refer to African-American employee could be evidence of discrimination, depending on the circumstances); *see also Lloyd v. Holder*, No. 11-CV-03154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) ("[C]ertain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness—words like 'welfare queen,' 'terrorist,' 'thug,' 'illegal alien.' … Title VII can hear racism sung in the whistle register."). But "courts decline to recognize allegations of code words when the words used activate no racial implications or bias." *Lloyd*, 2013 WL 6667531, at *9. And the little evidence of context that Cooper provides does not suggest that Espenberg's alleged use of the phrase "cracking the whip" was a coded reference to Cooper's race. *See* ECF No. 40-3 at 81 (Cooper testifying that she, Stadolnik and Espenberg, while meeting in Stadolnik's office, "were discussing … budgets for our departments, lab medicine and [therapeutic radiation], and

[Espenberg], she started using the word cracking the whip on me about laboratory medicine's budgetary process because it wasn't … the same as the way Peter Stadolnik would prepare [therapeutic radiation's] budget").[16] Likewise, Espenberg's comment that "some people are cleaner than others," made during a conversation about pest control, does not raise an inference of discrimination, even if a reasonable jury might find the comment rude or demeaning. *Cf. Lloyd*, 2013 WL 6667531, at *10 (holding use of adjectives like "inarticulate" and "entitled" to describe African-American woman was insufficient, on its own, to raise inference of discrimination); *Cuttino v. Genesis Health Ventures, Inc.*, No. 3:04-CV-00575 (MRK), 2006 WL 62833, at *6 (D. Conn. Jan. 11, 2006) (declining to hold "that language such as 'lying' and 'violent'—standing alone—are racial code words."). In any event, Cooper cannot establish that Espenberg's decision to discharge her was pretextual based on two stray remarks Espenberg made during the years they worked together.

Thus, based on the evidence Cooper has presented, no reasonable jury could conclude that Yale intentionally discriminated against Cooper. I therefore grant Yale's motion for summary judgment as to Cooper's racial discrimination claim.

---

[16] In other cases, litigants have argued that the idiom "cracking the whip" is a reference to slavery. *See, e.g.*, *Adams v. Home Depot USA, Inc.*, No. 05-CV-01798, 2007 WL 4565163, at *5 (D. Or. Dec. 19, 2007) (noting that plaintiff believed the phrase "[g]et your ass moving or I'm going to crack the whip" was "a reference to slavery" and he "found it very racist and highly offensive," but concluding that this statement "do[es] not constitute direct evidence of discrimination because [it] require[s] an additional step to infer a racial slur"); *Rinsler v. Sony Pictures Ent., Inc.*, No. 02-CV-04096, 2003 WL 22015434, at *1 (S.D.N.Y. Aug. 25, 2003) (observing that "some African-American members of the staff thought" plaintiff's statement "that she would 'crack the whip' to keep [her supervisor] on schedule" had "connotations of slavery," but concluding there was no race discrimination because statement was not made by person who took adverse action against the plaintiff). However, Cooper does not make arguments about the phrase's history or contend that she believed Espenberg's was referring to slavery. Nor does she present evidence that suggests that Espenberg's comment was discriminatory because of the context in which it was used, Espenberg's inflection or tone of voice, or local custom. *Ash*, 546 U.S. at 456. No reasonable jury could infer that Espenberg discriminated against Cooper based on her use of a common idiom—even one that is arguably "racially-tinged"—without more. *See Garcia v. Bd. of Inspectors of Joliet Pub. Sch. Dist. 86*, No. 16-CV-7968, 2020 WL 6275001, at *23 (N.D. Ill. Oct. 23, 2020) (determining that "in the light most favorable" to the plaintiff, an employer describing herself "as a boss who 'cracks' the whip' … is a racially-tinged comment," but holding "that single statement … is not enough for a jury to find that [the employer] discriminated against Plaintiff because she is from Puerto Rico"); *Adams*, 2007 WL 4565163, at *5 (observing that "[d]epending on the context, the reference to cracking a whip could be considered an innocent expression to motivate a person to action or … a reference to slavery").

## 2. Age Discrimination

Cooper also argues that Yale discharged her because of her age. Again, I presume without deciding that Cooper has made a prima facie case of age discrimination,[17] and I find that Yale has met its burden of producing evidence of a nondiscriminatory reason for Cooper's discharge, i.e., Cooper's performance issues. Therefore, I consider whether Cooper has presented sufficient evidence that Yale's reasons were pretextual.

Cooper's age discrimination claim relies on much of the same evidence that she used to support her racial discrimination claim, including the same comparator evidence. At least three of the employees Cooper compares herself to, Bohan, Stadolnik, and Moccio, were younger than Cooper. ECF No. 17 ¶¶ 41-42, 44. As I have already explained, however, no reasonable jury could conclude that these employees were similarly situated to Cooper.

Beyond the evidence that supports her racial discrimination claim, Cooper also testified that, during a meeting with Espenberg and Stadolnik,

> [Espenberg] brought up about retiring, and she had said to me, oh, if she could retire at my age, she would go ahead and do it. And she says, oh, maybe you should consider retiring. And Peter Stadolnik's comment to that was, oh, yeah, you could come back as a temporary because casuals make more money …."

ECF No. 40-3 at 128. In general, "remarks relating to retirement ... are insufficient to defeat a motion for summary judgment in an ADEA case." *Hess v. Mid Hudson Valley Staffco LLC*, No. 16-CV-01166, 2018 WL 4168976, at *13 (S.D.N.Y. Aug. 30, 2018), *aff'd,* 776 F. App'x 36 (2d

---

[17] Cooper can make a prima facie case of age discrimination by establishing that she was "replaced by someone 'substantially younger.'" *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). Here, Cooper was asked to train three employees to take over her work, Bohan, Staldonik, and Moccio, all of whom are younger than she. ECF No. 17 ¶¶ 41-42, 44 (Yale admitting Cooper was asked to train these employees and they are younger than she). It is less clear from the record whether they were *substantially* younger. *See, e.g.*, *Spahr v. American Dental Centers*, No. 03-CV-04954, 2006 WL 681202, at *5 (E.D.N.Y. Mar. 14, 2006) (compiling cases and holding five year age gap did not "create an inference of age-discrimination because Plaintiff's replacement was not 'substantially younger'"); *Aiello v. Stamford Hosp.*, No. 09-CV-00161 (VLB), 2011 WL 3439459, at *19 (D. Conn. Aug. 8, 2011), *aff'd*, 487 F. App'x 677 (2d Cir. 2012) ("Although an inference of discrimination does not arise when a plaintiff is replaced by another person who is only slightly younger, courts have held that an age difference of eight years is 'not insignificant.'" (quoting *Tarshis v. Riese Org.*, 211 F.3d 30, 38 (2d Cir. 2000)).

Cir. 2019) (citations and internal quotations omitted). However, such remarks can "demonstrate pretext when combined with other indicia of an improper animus." *Id.* Thus, "comments concerning retirement … must be viewed in context, along with the specific language used and the number of times the comments were made." *Schug v. Pyne-Davidson Co.*, No. 3:99-CV-01493, 2001 WL 34312877, at *5 (D. Conn. Dec. 10, 2001).

Viewed in context, no reasonable jury could conclude that Yale intentionally discriminated against Cooper based on these remarks. First, Espenberg is only 1 year and 2 months younger than Cooper. *See Millane v. Becton Dickinson & Co.*, 84 F. Supp. 2d 282, 287 (D. Conn. 1999) ("The fact that [the decisionmakers and the plaintiff's replacement] were so close to plaintiff's age bars any inference of age discrimination."); *Chapotkat v. Cnty. of Rockland*, No. 11-CV-06209, 2014 WL 1373531, *9 (S.D.N.Y. Apr. 4, 2014) ("The fact that decision makers are close to Plaintiff's age, or older, weakens any suggestion of age discrimination." (citations, quotations, and internal alterations omitted)); *Starr v. Legal Aid Soc'y of City of New York*, No. 96-CV-06888, 1998 WL 477733, at *3 (S.D.N.Y. Aug. 14, 1998) ("[A]ny suggestion of age discrimination by the Ad Hoc Committee is rendered even more implausible by the fact that all four of the members of the Committee were very close in age to plaintiff."). And at the time Espenberg made these comments, Espenberg believed Cooper had failed a PIP, and had an incentive to encourage her to leave Yale. *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007), *aff'd*, 331 F. App'x 874 (2d Cir. 2009) ("[I]n the context of a heated work-related dispute, 'why don't you retire,' or 'better retire,' may be of no more significance than if he had said 'why don't you quit.'"). Finally, Cooper points to only one instance where Espenberg referenced retirement, and "stray remarks of a decision-maker,

without more, cannot prove a claim of employment discrimination." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

Since no reasonable jury could conclude that Yale intentionally discriminated against Cooper because of her age, I grant Yale's motion for summary judgment as to Cooper's age discrimination claim.

### B. Hostile Work Environment Claim

Cooper also alleges that Yale violated Title VII, CFEPA, and the ADEA by permitting a hostile work environment. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted). The ADEA and CFEPA follow Title VII's standard for evaluating hostile work environment claims. *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (ADEA); *Paiva v. City of Bridgeport*, No. 17-CV-00081 (WWE), 2019 WL 3842400, at *10 n.4 (D. Conn. Aug. 15, 2019) (CFEPA).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Harris, 510 U.S. at 23. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "There is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002). However, "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* at 374 (internal citation omitted). "Proving the existence of a hostile work environment involves showing both objective

and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation omitted).

Cooper claims that she was subjected to a hostile work environment after Espenberg took over the Department. Specifically, she argues that Espenberg subjected her to "unfounded discipline," "routinely punished, chastised, humiliated and otherwise took [her] to task … for conduct which she routinely allowed from numerous other employees," and tried to "force" her into "coerced retirement." ECF No. 40-1 at 58. Crediting Cooper's testimony, a reasonable jury might conclude that Espenberg criticized Cooper's work unfairly, was rude to Cooper (e.g., telling her "some people are just cleaner than others"), pressured Cooper to retire, and treated her poorly after she took voluntary retirement by giving her no real responsibilities and moving her out of her office.

"This assembled conduct," most of which is age- and race-neutral, "falls well short of the demanding Title VII [hostile work environment] standard as illuminated by cases dismissing claims based on comparable or more serious [discriminatory] commentary." *Wheeler v. Praxair Surface Techs., Inc.*, No. 21-CV-01165, 2023 WL 6282903, at *12 (S.D.N.Y. Sept. 26, 2023) (compiling cases and holding that facially racist statements from multiple managers, including "recurrent comments that Black people are lazy" and a "comment that … [a Black employee had] a 'slave name,'" fell "far short of satisfying" Title VII); *see e.g.*, *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 48 (2d Cir. 2018) (summary order) (holding that 11 incidents, including five "racially offensive remarks," were "not 'severe' or pervasive' enough" to support hostile work environment claim); *Livingston v. City of New York*,

563 F. Supp. 3d 201, 252 (S.D.N.Y. 2021) (holding that "belittling comments and constant questioning and accusations that [employee] was not Jewish," along with a few instances of other facially neutral mistreatment, were insufficient to support hostile work environment claim). Thus, Cooper's evidence is "insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment." *Demoret v. Zegarelli*, 451 F.3d 140, 146-47, 150 (2d Cir. 2006).

### C. Retaliation Claim

Under Title VII and CFEPA, it is unlawful for employers to retaliate against employees who exercise rights protected by those statutes. *See* 42 U.S.C. § 2000e–3(a); Conn. Gen. Stat. § 46a-60(a).[18] Title VII and CFEPA retaliation claims are both analyzed using the *McDonnell Douglas* burden-shifting framework. First, the plaintiff must establish a prima facie case of retaliation by showing "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001). "When the prima facie showing … is made, the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its action." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (citation omitted). "The plaintiff then bears the ultimate burden to show that the employer's proffered reason was merely a 'pretext for an unlawful motive.'" *Id.* at 88-89. The plaintiff "may carry this burden by reference to the same evidence used to establish a prima facie case, provided that the evidence admits plausible inferences of pretext." *Id.* at 88-89. "[A] plaintiff making a retaliation claim under [Title VII]

---

[18] Since Cooper alleges that she engaged in protected activity by complaining about racial discrimination, but not age discrimination, *see* ECF No. 40-1 at 29, I consider her retaliation complaint under Title VII and CFEPA, but not the ADEA.

must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).[19]

     (i)    <u>Prima Facie Case</u>

     In its summary judgment motion, Yale does not contest that (1) Cooper engaged in protected activity when she accused Espenberg of discriminating against her, (2) Yale was aware of this protected activity, and (3) the PIP constituted an adverse employment action. ECF No. 34-1 at 27-28 & n.3. Therefore, the sole remaining question is whether there was a causal connection between Cooper's complaint and the adverse action taken against her. "Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (citation and internal quotations omitted).

     Cooper complained about racial discrimination on April 11, 2019, and the PIP was implemented in May of 2019. ECF No. 35 ¶¶ 17, 25; ECF No. 40-2 ¶¶ 17, 25; ECF No. 34-6 at 3 (listing May 28, 2019 as the start date for the PIP). "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), *abrogated in part on other grounds by Nassar*, 570 U.S. 338; *cf. Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (observing that five month period between protected activity and adverse action "might be enough to establish a prima facie case"). However, "[w]here timing is the only

---

[19] It is "unclear whether retaliation claims under CFEPA are subject to a but for or motivating factor standard of causation." *Dawson v. Sec. Servs. of Connecticut Inc.*, No. 3:20-CV-01310 (SVN), 2022 WL 17477601, at *9 n.6 (D. Conn. Dec. 6, 2022). But I need not decide this question here, because I dismiss all of Cooper's federal law claims, and I decline to exercise supplemental jurisdiction over Cooper's state law retaliation claim.

basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

According to Yale, Cooper's PIP was part of a "period of progressive discipline," which began with her 2015 demotion, continued with her needs improvement rating in two categories on her FY 2018 performance evaluation, and ended when she failed the PIP and was terminated. ECF No. 34-1 at 28-29 (quoting *Slattery*, 248 F.3d at 95). I disagree, because *Slattery* is distinguishable from this case. In *Slattery*, the plaintiff's employer had reassigned him from his position and diminished his job responsibilities five months before the plaintiff filed a complaint with the Equal Employment Opportunity Commission. *Slattery*, 248 F.3d at 89. By contrast, Cooper was demoted in 2015, several years before the PIP, and she received several positive performance reviews in the interim period, ECF No. 40-5 at 1-10. *See Gladney v. City of Simsbury*, No. 3:13-CV-00646 (MPS), 2016 U.S. Dist. LEXIS 59718, *5 (D. Conn. May 5, 2016) (distinguishing *Slattery*, in First Amendment retaliation claim context, because "roughly three years passed from [the plaintiff's] discipline in 2007 to the events in 2010 that gave rise to her termination"). And though Espenberg marked Cooper "needs improvement" for two subcategories on the FY 2018 performance evaluation, that evaluation also stated that Cooper's performance "met/exceeded expectations" overall. *Id.* at 16. Plus, the PIP raised several issues with Cooper's performance that were not mentioned on the FY 2018 performance review, including the accusation that Cooper made "offensive, unclear, and misleading" communications. ECF No. 34-6 at 3.

Finally, Cooper does not rely on timing alone. Cooper testified that Espenberg reacted incredulously when Cooper raised her concerns about discrimination, which could lead a

reasonable jury to infer she was angry at Cooper. *See* ECF No. 40-3 at 83 ("She said, oh, you can't – are you serious[?]"). Cooper also claims that Espenberg began treating her differently immediately after she complained about discrimination. *See* ECF No. 40-6 at 10 ("[Espenberg] immediately began complaining about my work and faulting everything I did. She also blamed me for mistakes/errors made by others."). And Cooper testified that Espenberg did not assess her progress on the PIP fairly, repeatedly putting down that she "failed to improve," even as Cooper did "everything … that [Espenberg] asked." ECF No. 40-3 at 93. This evidence, in combination with the timing of the PIP, is sufficient to raise a de minimis inference of causation for the purposes of Cooper's *prima facie* case.

  (ii) <u>Non-Retaliatory Reason and Pretext</u>

   As with Cooper's disparate treatment claims, Yale has met its burden of articulating a legitimate non-retaliatory reason for placing Cooper on a PIP and terminating her, since it has produced evidence of Cooper's poor performance. *See* ECF No. 34-6 (listing the grounds for the PIP). Therefore, the burden shifts back to Cooper to establish that Yale's reasons were pretext for retaliation.

   To meet this burden, Cooper must show that "the adverse action would not have occurred in the absence of the retaliatory motive." *Hawkins v. New York State Off. of Mental Health*, 845 F. App'x 9, 10 (2d Cir. 2021) (summary order). In the Second Circuit, "temporal proximity alone is not enough to establish pretext." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence [that the employer's explanation was false,] such as inconsistent employer explanations, to defeat summary judgment." *Zann Kwan*, 737 F.3d at 847.

Taken together, the evidence Cooper presents is insufficient to support an inference that retaliation was a but for cause of Yale's adverse employment actions. First, Cooper has not made a strong showing that Yale's concerns about her performance were false. As I have explained, Cooper has admitted to some of the performance defects that formed the basis for the PIP, and some of those defects were consistent with poor performance cited in her FY 2014 performance evaluation. To the extent she denies or minimizes performance issues, she relies primarily on her own assessments of the seriousness of her performance deficiencies, three performance evaluations from Gentile from prior years, and the fact Yale asked her to train her replacements. None of this evidence establishes that Yale's reasons for discharging Cooper were pretextual. *See Ricks*, 6 F. App'x at 78 ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent."); *Johnson v. New York City Dep't of Educ.*, 39 F. Supp. 3d 314, 324 (E.D.N.Y. 2014), *aff'd*, 633 F. App'x 42 (2d Cir. 2016) ("[C]ourts in this Circuit have found that a change in performance reviews, without more, does not lead to an inference of discriminatory motive."); *Malloy v. Intercall, Inc.*, No. 08-CV-01182, 2010 WL 5441658, at *16 (D.N.J. Dec. 28, 2010) ("Being required to train younger work[er]s is not in itself evidence of pretext."). Thus, Cooper has identified no significant "weaknesses, implausibilities, inconsistencies, or contradictions in [Yale's] proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846.

Second, Cooper's prima facie case is tenuous, and does not "reasonably support an inference" that Yale intended to retaliate against Cooper. *Id.* at 847. The timing of the PIP is not enough, on its own, to establish pretext, in light of the other timing evidence in the record, which demonstrates that Espenberg's concerns about Cooper's performance predate the April 11, 2019 meeting. *See, e.g.*, ECF No. 40-5 at 12-14 (rating Cooper needs improvement in two categories

on performance evaluation, reflecting the period from July 1, 2017 through July 30, 2018); *see Perry v. John A. Guerrieri, DDS PLLC*, 518 F. Supp. 3d 665, 676 (W.D.N.Y. 2021) (granting summary judgment where "defendant's criticisms of plaintiff's performance *predated* her first complaint of harassment"). As to Espenberg's reaction to Cooper's complaint about racial discrimination, a single incredulous comment is not sufficient to establish Espenberg acted with retaliatory animus. Therefore, no reasonable jury could conclude that retaliation was a but for cause of the PIP and Cooper's termination.

### D.  Intentional Infliction of Emotional Distress Claim

To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the actor intended to inflict emotional distress or that [she] knew or should have known that emotional distress was the likely result of [her] conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Fernandez v. Clean Harbors Envt'l.* Servs., Inc., 2006 WL 8447751, at *2 (D. Conn. May 30, 2006) (citations omitted). Rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527 (2012) (citation and internal quotations omitted). The conduct that Espenberg allegedly engaged

in does not meet this high bar. While the events leading to Cooper's termination may have been "distressing and hurtful" to her, nothing Cooper describes was "so atrocious as to exceed all bounds usually tolerated by decent society." *Appleton*, 254 Conn. at 212.

## V.    CONCLUSION

For the reasons above, I grant Yale's motion for summary judgment (ECF No. 34) as to Cooper's Title VII and ADEA claims. I also grant Yale's motion for summary judgment as to Cooper's CFEPA age and race discrimination claims, and hostile work environment claims. I decline to exercise supplemental jurisdiction over Cooper's remaining CFEPA retaliation claim and dismiss that claim without prejudice. The Clerk is directed to close this case.


                                                IT IS SO ORDERED.


                                      _____
                                                /s/
                                         Michael P. Shea, U.S.D.J.


Dated:  Hartford, Connecticut
         February 29, 2024